May it please the Court, Your Honor, my name is Julie Mersch. I represent the appellant Mia Decovich. The District Court committed both factual and legal error when it failed to follow the plan definition of disability. The plan definition of disability required Decovich to prove by preponderance of the evidence that she was disabled due to sickness. In construing the remand order from this court to say that the court did not have to consider any alleged mental condition, the court prevented Decovich from providing evidence in support of her burden of proof. All the doctors in this case agree on both sides of the fence that she suffered from fibromyalgia syndrome. Fibromyalgia syndrome, as this court and other circuit courts across the country recognize, is largely a subjective, largely is proven by subjective symptoms that are not provable by objective medical evidence. The District Court made absolutely no factual findings regarding the impact of these subjective symptoms on Ms. Decovich's ability to work as a card dealer. Specifically, there was no discussion in the record of her widespread pain, no discussion in the record of her depression, no discussion in the record of her acute distress and anxiety, no discussion in the record of her crying that was observed repeatedly by her doctors in the office, no discussion of her brain fog, no discussion of her fatigue or insomnia, no discussion of the side effects from her treatment with medications for pain, including suicidal ideation. There was no discussion of her headaches and there was no discussion of how her subjective symptoms would allow her to attend and concentrate and do what a card dealer has to do. There was also absolutely no discussion or reference to the eloquent appeal letter that Ms. Decovich submitted, setting forth both the physical and the subjective cognitive emotional symptoms that she suffered from and also how those symptoms affected her ability to work as a card dealer day in and day out. The employer statement says that her job required her to work five days a week over 40 hours. Yet the court does not in any way address that, um, that order. Can I just focus you on, I guess, what I find a difficult obstacle for you to get over in order for you to prevail? So tell me if I've got something in terms of my understanding of the record wrong. You're right that there's no dispute that she suffers from, your client suffers from fibromyalgia. Um, and there's no question, I don't think, that she also has pretty serious psychological or psychiatric issues as well. And the question is whether those are caused by the fibromyalgia or whether instead they are themselves kind of a separate condition, right, that wouldn't be covered under the provision of the policy you're seeking benefits under. And just so I could finish the thought, and it seemed like there were at least, if I remember, two of her, of your client's specialists who themselves endorsed the notion that, boy, to the extent that she's not, she's suffering all these psychological issues, I think that's actually separate. It's kind of its own separate thing, and it's not, in fact, caused by the fibromyalgia. And what she needs to do is get psychiatric care. And if that were, if that understanding of your client's condition were accepted, it seems like you would lose. That's where I'm sort of stuck. I don't believe, I disagree in that. I don't believe that this particular policy requires that she prove a particular psychological condition or physical condition. She only has to show that she's sick as a result of a disorder of the mind or body. No, no, no, no. Tell me if I, that is definitely not how I've understood this. I've understood there to be, you need to show that her disability arises from a physical condition, most definitely not a mental condition, because that's a separate two-year capped, you know, there's a cap on the benefits there. And she hasn't even sought the medical care she would need to qualify for benefits under that. So that's why I say, if, in fact, you sort of shunt all of the disabling conditions she suffers from into the medical, mental condition box, she's going to be out of luck. And I think that's basically what the district court ended up concluding. I don't, fibromyalgia syndrome is a physical condition with cognitive symptoms. And so Right, right. But the problem being that you then need to show that those psychological conditions are stemming from the fibromyalgia, whereas these specialists say, no, actually I think they're stemming from this separate psychiatric condition that she needs treatment from a psychiatrist for. But she never did go for the treatment from a psychiatrist, notwithstanding the recommendation that she should. She did not, Your Honor, but that was not a reason that they denied the claim. But back to your point, let's be clear. The medical records that Dr. Ginron referred to stated that at this point in time we believe her illness is psychiatric in nature. But in March of 2010, the neurologist, Dr. Baker, said, I believe her primary disability is fibromyalgia syndrome. Dr. Ginron tried to get the doctors, the treating doctors, by referring by, well, he never spoke to Dr. Baker. He just looked at his medical records and concluded that now her impairment is psychiatric in nature. He did not, there's no evidence in the record that he said she now is not still suffering from fibromyalgia syndrome. He's saying she is impaired. There's no disagreement that they believe that she was impaired. At the end of this evolution of symptoms from psychiatric or cognitive emotional problems, that is correct. But none of the doctors ever said, that I see in the record, that it did not stem originally from her fibromyalgia syndrome. Who's the one who has the, it's like, I can't remember, is it like in a parenthetical? It's sort of, I wish I could remember the specific names of the doctors that are all mixed up. Dr. Sy was her primary doctor, her primary care physician. It's one of the specialists, who I thought said, basically at this point, I'm led to believe that this is really stemming from kind of a separate psychiatric condition, not so much from fibromyalgia or something to that, or secondary to, something like that. I believe there's a reasonable interpretation in the records that maybe it looks like she has a psychiatric disease process, but she was only always diagnosed with fibromyalgia syndrome. That's why she was sent to Dr. Baker, the neurologist. That's why she was sent to doctors who knew the rheumatologist. So several of her doctors, several of the doctors in the record said that the mental problems were the result of the worsening pain from fibromyalgia. Is that correct? Yes, Your Honor. And then there was another doctor who said, who seemed to say that this is independent of the fibromyalgia. Was there a, is it clear that they were in disagreement, or I'm not? I don't think that Anthem and CDS ever asked them for any information whether there was a psychiatric disease that was separate and apart from fibromyalgia. Ms. Dukovich is simply trying to prove that she does suffer from a sickness. Her symptoms of impairment have evolved from fibromyalgia syndrome to cause the psychiatric and to Judge Horman's point, untreated psychiatric symptoms. But her treating physician and Dr. Genoux, who treated her fibromyalgia, never, I mean, they may have anecdotally said she's got a psychiatric disease process, but I submit that there's no evidence in the record that she had any DSM order that was not related to the fibromyalgia. And in that regard, that's why I thought it was important for the district court to listen to what Ms. Dukovich said herself in her own letter, and at least give it some, I mean, some merit. There was no evidence in the record whatsoever that these symptoms didn't exist and that she wasn't credible. So if the medical information did not decide the day, I mean, why not look and at least listen to her and say how these symptoms did evolve. And we have some case law recognizing that fibromyalgia can lead to mental depression and mental illness. Yes, Your Honor. And I cited the cases in my, there's the Jordan v. Grumman case, which is a Ninth Circuit case. There's also cases citing Jorman in California cases that I cited, the Abdulla case. There's also the Beatty v. Prudential case, which I cited in my brief, which is actually a Ninth Circuit case that reversed under the clear error standard. In this case, there's both, in my opinion, legal error and there's clear error under the factual findings as well, because the district court specifically set apart or truncated evidence that prevented Ms. Dukovich from providing subjective proof in support of her disability claim. And that is, Your Honor, where I'm saying she had to show that she was sick. That is what the definition, planned definition of disability said. You know, she's disabled as a result of sickness, not as a result of something more specific like a physical illness. I mean, the district court properly said it was a physical illness, but then failed to incorporate what was all, do a thorough inspection of the administrative record to say, okay, these psychological issues, these cognitive, these emotional issues that she's having should be considered by me. I may reject them or not, but they need to be considered because they're part of the administrative record and that they are part of a sickness that she is claiming under this policy. The court did not do that. So I do think that under the clear error standard for factual findings, I believe that the court, by not, specifically not making any factual findings regarding the subjective symptoms of fibromyalgia, erred, but also, I believe, by legally erred, which is subject to a de novo review, by truncating the evidence and saying I'm not going to consider a thing related to an alleged mental condition. So I believe under the — if you don't reach on the clear error standard of factual findings, I think the court clearly erred by not considering that evidence. How can she prove her case if most of these symptoms that she's suffering from are not even considered by the lower court? So I — and the other thing is that I believe that the — in this case, because her credibility wasn't challenged, the — her appeal letter setting forth all her subjective complaints and how they affected her ability to work as a card dealer were not considered. This was a case in which — and there was no IEME done or functional capacity evaluation done in this case. So I think in this case, you still had to — you really had to consider what she had to say and what the science says are the symptoms associated with fibromyalgia syndrome. And that simply wasn't done here. If the court had done that, then I may not have a legal argument under de novo review, but I do have that here because it was not considered. It just simply wasn't considered. It was — did — at the end, the district court's final comments are, well, she has some physical — I do think that there is some physical difficulty, but I don't think that gives rise. Well, that's not the standard under the policy. The standard is, due to sickness, was Ms. Tachovich unable to perform the essential functions of her regular occupation? And there's no analysis of that in the record, whether she was or was not. I would like to reserve my time at this point, if that's all right. Thank you. Roberts. Very good. We'll hear from your opponent. Good morning. Anna Martin on behalf of Anthem. May it please the Court, it's a pleasure to be here today. I'd like to address, first of all, the district court painstakingly reviewed the administrative record in this case, which include all the medical evidence, twice. The plaintiff in this case did not satisfy her burden that she is disabled under the policy. Plaintiff wants it both ways. She wants to use mental illness as both error and evidence. And in this instance, the court did exactly what this court ordered it to do. And basically, plaintiff did not claim to be disabled based on a mental condition. And so, when you look at the administrative record and you compare it to the district court did, the district court basically took, removed all of the opinions that said her, basically all of her symptoms were due to a psychiatric illness. And then looked at the record without that conclusion. And the district court absolutely considered mental illness when discussing the opinion. If you look at the district court, the district court first cited to Dr. Gendron stated that he believed that her ailment was mostly psychiatric, that her illness was due to psychiatric condition. The court said, I'm not going to consider that, because, again, it goes to that conclusion that her condition is due to psychiatric condition. But then the court goes on to discuss references to other mental conditions. And the court in the order references Dr. Howard, who said that plaintiff complains of depression, but he was not sure what was the cause of the depression. And then, most notably, the district court goes to Dr. Gianu, who was her treating rheumatologist, who I believe Justice Watford is who you were referring to. He's the one who directly in response to a letter from Dr. Gendron wrote a letter back. And he specifically stated that plaintiff, that she was most likely impaired by severe depression with musculoskeletal manifestations instead of her fibromyalgia. And the reason why the district court cited that decision is because it addresses the issue here, is whether or not her condition, her disability was caused either by the fibromyalgia or the psychiatric symptoms. And Dr. Gianu answered that exactly, answered that exact question. And that was her treating rheumatologist. In this case, we most certainly have a consensus of medical. We have two of her treating, the orthopedic surgeon and the neurologist. And the neurologist would be the doctor to treat her for any mental fogness, for cognitive issues. There's no mini mental status exam. She was not referred for cognitive testing. None of those things. And so we have Dr. Baker, who's the neurologist. He says, I think all of her problems are psychiatric. She needs to see a psychologist, a psychiatrist or a psychologist. And there was a level of exasperation in his medical records because he couldn't understand why she still had not seen a mental health provider. Then we've got Dr. Baker, who's an orthopedic surgeon, who also is just noting that all the diagnostic testing is normal and the physical exams are essentially normal. And he also says, I have nothing further to offer her. She needs to see a psychiatrist. Can I ask you, though, the reason this just seems somewhat artificial, this dichotomy we're drawing, is because we know that fibromyalgia is a physical condition that there are no tests you can run to say, aha, we've discovered that you don't have this, right? Most of it is manifested in terms of your psychological symptoms, right? So I guess it just seems artificial to say, for any of these doctors to say, well, I've determined that it's due to some separate mental illness. Because, I mean, how would you, I mean, I'm not a doctor, so I don't question their expertise, but how can you ever really be sure that it's on this side of the line and not the other? Do you know? I'm not sure that you can decide what side of the line it's on, but just because you have, let's say you have fibromyalgia and it is creating psychological manifestation symptoms. You still, especially under this policy, you're obligated to get treatment for those. You can't just say, I'm disabled due to depression, but it's because of fibromyalgia and I don't need to seek treatment. This policy, you have to be under appropriate care. And when you have three of her own treating doctors telling her she needs to see a psychiatrist and you don't do it, then you aren't getting the care that you're required to get. Is this on which the district court? Absolutely not. Absolutely not. What I believe what the district court did is I think the district court did what this court directed and that was to set aside basically any conclusion where some doctor said, look, her impairment is caused by a psychiatric condition. The district court put that aside and then looked at the record as a whole and in establishing disability, which she did not meet. If you look at all of that, if you take out that psychiatric component that's the cause of her impairment, she didn't meet it. She's got no RNLs from Dr. Gianu, from Dr. Baker, from Dr. Milligan. The only one who gave them was Dr. Say, and the district court was well, well within its authority to look at that MSS statement and go, okay, look. Dr. Say didn't offer RNLs on two separate occasions prior. Then he offers these RNLs. He dates them back to 2008. She worked until September 2009. And then he later defers those RNLs. And the district court did not meet. Well, I don't understand because we in our prior decision seemed to say that it was statements concerning her not getting treatment were not a new reason for denying benefits, that she had never claimed that it was disability on the account of a mental condition. And so that on remand, they weren't to consider that. So how do we now conclude that this was mental and that she should be faulted for not getting treatment? I'm not even saying that you have to conclude that. I'm just saying that what I believe the district court did in implementing what this court ordered in a split decision. And remember, Justice O'Scallion believed that- And he lost. Yeah, he lost, but he strongly, he believed also that she had not satisfied her burden under the standard. And she didn't do so here. The district court followed the mandate of this court and removed that issue. And then looked at everything in the file to see if you take out the opinion that she's psychiatrically disabled. Did she satisfy that she's disabled? And the district court went through, and the district court did consider mental illness symptoms. He did consider those. And what's interesting is that he does, the one reference that he does talk about the psychiatric symptoms is he focuses on Dr. Giannou's opinion, who said, look, her psychiatric symptoms are not caused, I mean, her musculoskeletal symptoms are not caused by fibromyalgia, they're caused by a psychiatric illness. That's her own treating rheumatologist. So- Well, that's, I don't have all of that for me. But what the district court said was Dr. Giannou- Giannou. Found that plaintiff's ability to work in her position was more likely, quote, impaired because of her severe, quote, severe depression with musculoskeletal manifestations. And then the district court adds, with no quotes, instead of her fibromyalgia. And that sounds like that's what the district court was imputing to what the doctor said, rather than the doctor saying that she has a severe problem that has musculoskeletal manifestations. And it could very well be a result of the fibromyalgia. Well, Dr. Giannou did, his letter went on to basically mirror what the district court stated. And he said that her musculoskeletal symptoms were caused by severe depression, not fibromyalgia. Let me just read this and tell me if this is the language we're talking about. And I'm just going to read it without trying to correct the grammar or anything. I would incline to believe at this point that her physical complaints are related to her severe depression, and then this is the parenthetical I was trying to remember, less likely due to fibromyalgia. Is that what you're talking about? Yes, exactly. And that was his letter in response to a letter from Dr. Gendron. But, okay. But she's less likely. And then he also raises, well, I mean, the burden, she's got the burden of proof to establish that she's disabled. The burden is on her. We've got a doctor saying, look, it's less likely due to her fibromyalgia and more likely due to some psychiatric illness for which she hasn't sought treatment. And then we have neurologists, rheumatologists, and orthopedic surgeons commenting on someone's psychiatric state when they're not the proper doctor to be doing that because she never went and got the treatment. Does the record indicate why? No, no. It's just multiple requests and no falling through. And if we really want to get into treatment here, which is also a sign that her symptoms were not as severe as she claims is that she didn't seek treatment. She didn't go to physical therapy. She didn't do aqua therapy. She didn't go to the Balance Institute. She quit taking medications. I mean- Just to be honest with you, this record does not scream to me, this person is faking all of this and she really can work. That's what I think, and I won't speak for my colleagues, but that's what I find frustrating about this case. I don't doubt that she is experiencing all of the conditions she's claiming to, and then it just becomes, well, what box do you put it in? Does it stem mostly from fibromyalgia or does it stem mostly from this separate, I don't know how it could be separate, but some separate mental illness or condition? And that's what I'm saying. That just seems really artificial given how closely linked the two things that we're talking about are. I mean, possibly, except that this is a case in which she has to prove her disability. And we've got all these subjective symptoms, but we do not have treating doctor support for this disability. This isn't a case where we just had paper file reviews that disagreed with treating physicians. We don't have that. We have her doctors who are exasperated. They don't even- We've got an orthopedic surgeon and a neurologist who, they can't figure out what's wrong with her, and they keep thinking it's more psychiatric. And then you have her rheumatologist come in and say, look, I think it's less likely fibromyalgia. I mean, I'm not sure what more an insurance company can do in this instance. I mean, we don't have the support. There aren't the R and L support for a claimed disability here, and the burden was on her. And it's twice that the district court has been through this record and came down the same way. And I really believe that an overall review of this record, to me, I think more, definitely demonstrates that she didn't satisfy her burden that she's disabled under this policy. Can I ask you a question about the clause in the policy and what effect it has? It says that Anthem reserves full discretion and authority, and then I'm going to skip a few, to interpret all policy terms and conditions. How does that affect our review? It has no effect on your review, Your Honor, because the court ruled on that. The district court ruled on that. Anthem did not have discretion, so your review is de novo. And the court's review was, I mean, your review isn't de novo. The district court's review was de novo. So yeah, it has no bearing on this case. Okay. Okay. Any questions from the colleagues? No, all right. Thank you very much. Thank you very much. We will give you, you have about two and a half minutes for rebuttal. So Dr. Howard was the first consultant that Anthem used. He was a rheumatologist. He diagnosed, he's the first one that said, yes, she's got fibromyalgia syndrome. And he noted medication, that she had side effects from the medication. And those medications are treated specifically for fibromyalgia syndrome. Over the course of her treatment, that's before the record, she was on Neurontin. She was on Effexor. She was on Cymbalta. She was on Civella. And there were other medications that she were on. But those were all related, were fibromyalgia medications to help treat depression. So that may address your question in terms of the box. But what about this letter from Dr. Genow to Dr. Gendron? I don't know how to say the names. Okay. So the question is whether she was sick. I've maintained the position that by the time Dr. Genow wrote that letter in response to Dr. Gendron's posit, is she more impaired by physical or by psychological, psychiatric? It was in September of 2010. She had submitted her claim in January of 2010. And if you look at the record, she was getting much worse from a psychological standpoint. So I believe at the end of the day, she was impaired from working. And I believe that's what all the — everyone agreed that she had an impairment and that it prevented her from working. Yes. Yeah. But it's the source. What's the source of that impairment? And that parenthetical, less likely due to fibromyalgia, that's from her own — your client's own doctor. So how do you respond to your opponent's argument that, like, well, we're the insurance company. We get that. What are we supposed to do? Is it — I mean, under the definition of disability, does it matter what the source is of an impairment? I think that's the whole issue here, isn't it? I do. And I argue that it's — I argue that it's — she's sick and that it — I mean, he was responding to a letter as to what is the etiology of the impairment. And at that point, that was his — that was one person's opinion, that at that point — but that was all that was in the record from that. I mean, he — I don't — he wasn't asking, did she have restrictions and limitations from fibromyalgia. My opposing counsel said she didn't offer any restrictions and limitations in support of her burden of proof, but she never was asked to do that. That — the definition in the policy says what you need to do. If you look at the proof of loss provision, it says you need to fill out these forms, and then you need to provide us anything that we ask you to provide. In the — if you recall, in the record, her roommate calls in and says, how does she prove this? What does she do? And the response in the record is, you just look at the medical records. It's what's in the medical records. So she did the best she could, getting Dr. Tsai to submit a medical source statement and to submit her own letter based on what was all that she could determine. But she was never said, you need to get Dr. Baker to send in restrictions and limitations. You need to get Dr. Yeh to send in restrictions and limitations. The letters that they responded to that were sent to Dr. Baker was, tell us the — we know she's got — basically, we know she's got an impairment, but is it more psychiatric or is it more physical in nature? And he took — Dr. Ginron took from the medical record from Dr. Baker, at this point in time, in July 2010, it's psychiatric. And he took from what Dr. Genoux said, that at this point in time, it's more likely related to depression. I mean, Your Honor, honestly, I don't know if we talked to Dr. Genoux if he would say — but I would treat her for fibromyalgia syndrome, and I believe that that's — it's related to that. But I believe the definition is broad enough in the policy that her impairment is — that the district court had to consider everything as to determine whether she was sick, and whether that sickness caused her to be unable to perform the essential duties of a card dealer. That — that was never examined in this record. And I believe that that constitutes clear error. I see that my time's up. I'm sorry. It should be reversed. Do you define — can I just — do you define impairment as being unable? It may have impaired her, but was she unable to perform the duties of a card dealer? Well, I took the word impairment from — because that was used by Dr. Ginron in his letters. I believe that in conjunction with what Dr. Genoux wrote, and with the medical source statement by Dr. Tsai, but by — also by Ms. Dikovich's consistent reporting of pain, her appeal letter — she's going to all these doctors. I don't think this is some — a person that's not sick that — that can work. I believe she's sincere. So I believe that it — to answer your question, I believe that in — she — she herself, in conjunction with those two doctors, met her burden that she was unable to perform the duties of a card dealer, which are — were very difficult in addition — I mean, more so cognitively than almost physically because of all the money she had to count. I mean, we all probably know what dealers do. And so I — I do believe the district court failed to make that — make that determination. And that — that prejudiced her as to whether her impairments or her inability to work, all her subjective symptoms that she credibly testified — or credibly submitted to the — to the administrator prevented her from performing her essential functions. That was not considered by the court, and that was clear error. And this should be reversed, and benefits should be instated through the first 12 months remanded for ongoing adjustment. Okay. Thank you, counsel. Thank you for giving me the extra time. Sorry I went on. Of course. This is a very difficult case, and we appreciate your arguments today. Thank you. The case just argued is submitted, and we are now adjourned for the week.
judges: Schroeder, Watford, Korman